ANDERSON, GREENWOOD
& CO., Appellant,

v.

Warner G. "Buck" MARTIN, Kevin P.
Martin, Nibsco Supply, Inc., Niabco
Equipment & Industrial Sales, Inc.,
Nibsco Equipment & Industrial Sales
of Ohio, Inc., Nitram Energy Inc.,
Flow Safe, Inc., Flow Safe Supply,
Inc., and Irving Shuman, Appellees.

No. 14–98–01274–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

March 29, 2001.

Rehearing Overruled May 3, 2001.

202

Roger B. Cowie, Dallas, Craig L. Weinstock, Houston, Charles W. Rhodes, Dallas, for appellants.

Kenneth W. Rhodes, Dallas, Kenneth R. Wynne, John R. Feather, Houston, for appellees.

Panel consists of Justices SEARS, DRAUGHN, and LEE.*

## OPINION

ROSS A. SEARS, Justice (Assigned).

Anderson, Greenwood & Co. (AGCO) appeals from a take-nothing judgment in their contract suit against appellees (collectively referred to as "Nibsco"). In four issues, AGCO asserts: (1) the trial court erred in disregarding the jury's findings that Nibsco's breach of contract caused AGCO damages of $120,000.00 plus $750,000.00 attorney's fees; (2) the evidence is legally and factually insufficient to support the jury's findings of AGCO's tortious interference with Nibsco's contract with Praxair; (3) the trial court erred in not awarding AGCO ownership of the F80 valve patent and machine drawings notwithstanding the jury's findings; and (4) the evidence is legally and factually insufficient to support the jury's findings that AGCO incurred no appellate attorney's fees. We affirm.

## BACKGROUND

AGCO is a large manufacturer of safety relief valves, and sells its valves through independent representatives such as Nibsco. Nibsco, and the other corporate appellees, are owned by appellee Buck Martin and his family, and they operate their business primarily in New York State and Ohio.

In the early part of 1993, the parties entered into a written agreement whereby Nibsco would sell AGCO's products. The contract provided that it could be terminated at any time, without cause, by either party giving the other party sixty days prior written notice. This lawsuit primarily concerns clauses providing the duties and obligations of the representative (Nibsco) as follows, in pertinent part:

1.4. *Direct Sales by Manufacturer or Other Sales.* ... Manufacturer may, from time to time retain for itself or for other designated sales representatives(s) certain "National Accounts" for the sale of Products. Any such National Account will be automatically withdrawn from coverage hereunder and Representative will not thereafter be entitled to any commission or compensation whatsoever from Manufacturer on sales made by anyone to such National Account....

4.3. *Market Information; Sales Report.* Representative [Nibsco] agrees to provide to Manufacturer [AGCO] from time-to-time in the future, on a nonconfidential basis, forecasts, market studies and such other reports pertaining to customers, markets, and Products covered by this Agreement as Manufacturer may reasonably request.

4.4 *Competitive Products; Remanufactured Goods; Other Accounts* . During the term of this Agreement, neither Representative nor any Affiliate (as defined below) shall in any manner manufacture, stock, sell, lease, promote or advertise any goods (including parts therefor) or services which are directly or indirectly competitive with (whether in purpose, function or otherwise, including, but no limited to, used, reconditioned or remanufactured goods) or in any way similar to the Products (including parts therefor).

6.1. *Use of Manufacturer's Name; Intellectual Property Rights.* All intellectual property rights relating to the Products and/or to this Agreement, including, but not limited to, all trademarks, copyrights, patents, trade names, trade secrets, logotypes, advertising and

---

* Senior Justices Ross A. Sears, Joe L. Draughn, and Norman Lee sitting by assignment.

other commercial symbols, service marks, and goodwill (herein collectively referred to as "Intellectual Property"), are and shall remain the sale property of Manufacturer.

\* \* \* \* \* \* \* \* \*

Representative agrees that any Intellectual Property that may be developed in the course of Representative's performance of this Agreement or which relates in any manner to the Products shall be the sole property of Manufacturer.

7.4. *Disposition of Stock on Termination.* ... In the event Manufacturer terminates this Agreement, Manufacturer shall repurchase ... any or all of the Products listed herein which Representative purchased from Manufacturer.

Nibsco proposed a modification of some of the terms of the agreement in a "side letter" agreement from Nibsco to Ed Ross, Vice President of AGCO's Sales and Marketing, dated January 26, 1993. Mr. Ross signed the letter agreement accepting and agreeing to its terms on July 13, 1993. The "side letter" modified the reporting requirements of section 4.3 by agreeing that Niabco Ohio will mail AGCO written quotes involving AGCO products sent out by any of the companies to their customers for the previous month. Section 4.3 was further limited in that all other information "will not be required until AGCO is fully capable of handling it at its factory...." Also agreed was the "customer swap" program whereby Nibsco would furnish its customers reconditioned AGCO valves. AGCO also agreed to allow Nibsco to continue to assemble and purchase parts to valve assemblies, which may include the purchase of valves from other manufacturers. AGCO also agreed that Nibsco could sell its F70 unloader valve, Ful Flo oil valves, Asco solenoid valves, ball valves, butterfly valves and other un-

loading valves. AGCO agreed that it "does not have any present intention to classify any of Nibsco's ... existing customers as a 'national account' " under section 1.4 of the agreement.

Kevin Martin (Buck Martin's son), president of Nibsco, testified that Nibsco "reverse engineered" AGCO valve components by making duplicate parts from AGCO valve components. He stated that Nibsco used Tony Staub's machine shop to make these parts. He testified that Nibsco worked on and developed the F80 valve during the tenure of the agreement, but made no attempt to sell it to any of their customers. Upon termination by AGCO, Nibsco made a written request to AGCO to repurchase Nibsco's remaining inventory of valves, and Nibsco then shipped the inventory to AGCO. Mr. Martin testified that all valves were purchased from AGCO, and that they owed AGCO nothing on their purchases. Mr. Martin stated that AGCO never paid them anything under section 7.4 of the agreement, nor did they ever return any of the inventory. AGCO contended that some of the parts were obsolete and some were "counterfeit." Mr. Martin said Nibsco pulled out all parts that were not AGCO's at an inventory with AGCO's representative.

In 1990, Warner G. "Buck" Martin engaged Walter Powell, a design engineer, to develop the F80 valve which was similar to AGCO's 80 series valves. Mr. Martin testified that there had been no changes in AGCO's 80 series valves since 1968, and he had experienced leaking problems with some of AGCO's valves. In 1990, AGCO terminated Niabco Florida, and Mr. Martin began to develop other plans in case AGCO terminated Nibsco. Mr. Martin stated that they had sold AGCO products since 1966. He was reluctant to sign the 1992 agreements because he was worried about AGCO cancelling Nibsco. He stated

that AGCO told him to "put Florida out of [his] mind," that there would be "no change" at Linde Praxair, and that they would have a long-lasting relationship. Flow Safe was incorporated in 1991, before the agreements with AGCO. Flow Safe was set up to do research and development on the F80 valve. Nibsco did not sell these F80 valves until after AGCO terminated their contract in 1995.

Gregory Hyland, president of AGCO, testified that he terminated Nibsco's agreement because: (1) Nibsco was selling a competitive valve, known as the F70RR, as a substitute for certain AGCO valves; (2) Nibsco was selling AGCO valves outside of its territory; (3) Nibsco was making duplicate valve parts; and (4) Nibsco became the master distributor for Sabre-Valves, one of AGCO's competitors.

Mr. Hyland testified that he talked to Buck and Kevin Martin about a blanket contract with Praxair whereby AGCO would sell valves to Praxair direct and pay Nibsco a commission. Mr. Hyland testified that AGCO had been talking to Praxair since 1991 about a discounted direct-sales contract.

Praxair was Nibsco's biggest customer and provided a large part of Nibsco's income. Nibsco contended AGCO committed fraud in the inducement of the contract, and wanted Nibsco to enter the contract so AGCO could get confidential information concerning Praxair. Nibsco alleged that once AGCO acquired all the information it needed concerning Praxair, it would terminate Nibsco's contract without cause, then sell directly to Praxair with no commissions to Nibsco. After AGCO terminated the contract with Nibsco in 1995, AGCO entered into a direct sale contract with Praxair in March 1996.

## BREACH OF CONTRACT

In its first issue, appellant contends the trial court erred in disregarding the jury findings awarding AGCO damages for Nibsco's unexcused breach of contract and for AGCO's attorney's fees. In response to Question No. 1, the jury found Nibsco failed to comply with their agreements with AGCO. In Question No. 2, the jury found that Nibsco's breach was not excused because of a false representation or concealed material fact by AGCO. In Question No. 3, the jury found that AGCO was damaged by Nibsco's breach of contract in the sum of $120,000.00. In Question No. 25, the jury found AGCO incurred reasonable attorney's fees for preparation and trial in the sum of $750,000.00. In Question No. 28, the jury found that AGCO committed fraud against Nibsco, but found in Question No. 29 that Nibsco suffered no lost profits as damages. Based on this jury finding of fraud by AGCO, the trial court entered its order disregarding the jury findings awarding AGCO damages for Nibsco's breach of contract and for AGCO's attorney's fees.

AGCO's arguments are: (1) fraudulent inducement does not excuse a breach of contract unless the benefits received under the contract are returned; (2) AGCO did not fraudulently induce the agreements; (3) the jury charge regarding Nibsco's fraud claim contained an invalid theory of liability; and (4) if AGCO's fraud precludes its recovery for breach of contract, then the jury's finding of fraud by Nibsco precludes its recovery.

## Affirmative Defense of Fraudulent Inducement

In its first subpoint, AGCO contends that Nibsco had only two alternatives: to stand on the contract and recover damages for fraud, or "return the thing bought, and receive back what he paid" citing *Dallas Farm Machinery Co. v. Reaves*, 158 Tex. 1, 307 S.W.2d 233 (1957). AGCO contends

that rescission and return of the benefits is unavailing because Nibsco never offered to return the "benefits" received. AGCO asserts the "benefits" consist of the "millions of dollars ... received from AGCO under the Representative Agreement." As its second subpoint, AGCO asserts that Nibsco has no claim for fraud because the jury found Nibsco suffered no monetary damages in its answer to Question No. 29.

## Return of the Benefits

The question in *Dallas Farm Machinery Co.* was whether parol evidence is admissible, in the face of a "merger" clause (disclaimer of all warranties not contained in the agreement) in a written contract, to establish that the contract was induced by fraud. 307 S.W.2d at 233. The supreme court held that parol evidence was admissible to show fraud in the inducement. *Id.* The supreme court stated the well settled rule that one who is induced by fraud to enter into a contract has his choice of remedies: "He may stand to the bargain and recover damages for the fraud, or he may rescind the contract, and return the thing bought, and receive back what he paid." *Id.* at 238–239. The Dallas Farm Machinery Co. sued Reaves for the balance due on a contract for the sale of an Oliver tractor. Reaves counterclaimed for rescission, and the trial court granted judgment to Reaves on his claim for rescission of the contract and restoration to him of the value of machinery he traded-in on the defective Oliver tractor purchased from Dallas Farm Machinery. *Id.* The Oliver tractor was recovered by Dallas Farm Machinery by their writ of sequestration.

AGCO further cites *Arnold v. Wheeler* as authority for its contention that the "benefits" must be returned when a contract is induced by fraud. *Arnold v. Wheeler,* 304 S.W.2d 368, 370 (Tex.Civ. App.—San Antonio 1957, writ ref'd n.r.e.). *Arnold* involved a suit by a receiver of an insurance company against an agent to return premiums collected by the agent from the policy holders which the agent was going to use to purchase other policies from a different insurance company. *Id.* The appeals court held that where a contract between the insurer and the agency placed the agency under a duty to collect premiums on all of the insurer's policies and to receive and hold all money collected in a fiduciary capacity, the agency had no right, even if the insurer's service under policies sold was unsatisfactory, to cancel all policies and to use premiums collected therefor in order to place policies with a different insurer. *Id.* The trial court disregarded the jury findings of fraud in the inducement for several reasons. One of the reasons was that agents testified they functioned under the contract for more than a year, but never made, nor offered to make, any restitution, though they retained the benefits of the contract. *Id.* If the contract was fraudulently induced, defendants are not entitled to retain the benefits which they collected under the contract. *Id.*

*Chilton Ins.v. Pate & Pate Enterprises,* 930 S.W.2d 877 (Tex.App.—San Antonio 1996, writ denied), is also cited by AGCO as authority. In *Chilton,* a surety (Chilton Insurance Company) for a subcontractor on a public works project entered into a takeover agreement with the general contractor (Pate) for the completion of work following the subcontractor's default. *Id.* at 884. Because of Chilton's delays and other problems, Pate withheld payments to Chilton even though Chilton continued to perform, and Pate received progress payments from the City based upon Chilton's continuing work on the project. *Id.* When the project was completed, Pate acknowledged that Chilton was entitled to a credit because of its work, but claimed that Pate

had been damaged because of Chilton's poor performance. Chilton sued for breach of contract, and Pate counterclaimed for breach of contract. *Id.*

The court of appeals determined that the critical question was whether Pate waived its excuse for nonperformance by treating the contract as continuing despite Chilton's alleged material breach and supposed misrepresentation. *Id.* at 887. The court found that Pate treated the contract as continuing after Chilton's material breach, and Pate forfeited any excuse for its own breach. *Id.* at 888. Pate then argued that its nonperformance was excused because a misrepresentation by Chilton induced Pate to enter into the takeover agreement. *Id.* The court stated: "A misrepresentation which induces a party to enter a contract, while making the contract voidable at the instance of the innocent party, does not excuse nonperformance." The court found that Pate was forced to choose one of two mutually exclusive courses of action. Pate must either discontinue its own performance, rescind the contract, and sue for material breach, or continue its performance and lose the other party's material breach as an excuse for its own nonperformance. *Id.* The court did not address the misrepresentation by Chilton, and concluded that Pate's failure to comply with the takeover agreement was not excused because Pate elected to treat the contract as continuing after Chilton's material breach. *Id.*

■ In their brief, AGCO argues that Nibsco failed to return or offer to return the "benefits" they received under the contract, but fails to cite to the record *what* benefits, if any, AGCO concludes were not returned. We cannot discern from AGCO's conclusory argument whether the benefits are the profits Nibsco made from the sales of AGCO's valves, the commissions Nibsco owed AGCO on their sales of

AGCO's products, or the retention of some merchandise without payment. Nibsco cites to the record where evidence shows that it paid AGCO in full for all products sold by Nibsco. Nibsco further asserts it returned any products it had on hand after the contract was terminated. Nibsco contends that it asked AGCO for a refund for the returned valves they bought, but AGCO alleged Nibsco owed more than the refunds due.

Absent any cite to the record where AGCO kept something it was not entitled to under the contract, and argument as to what "benefits" were not returned, we consider AGCO's contention that Nibsco cannot rescind because it kept the "benefits" inadequately briefed. TEX.R.APP.P. 38.1(h); *Tacon Mech. Contractors v. Grant Sheet Metal, Inc.,* 889 S.W.2d 666, 671 (Tex.App.—Houston[14th Dist.] 1994, writ denied). AGCO has waived its contention that Nibsco failed to return the "benefits."

■ In any case, Nibsco pleaded the affirmative defense of fraud in the inducement in its answer and did not ask for a rescission of the contract. Nibsco counterclaimed for damages from the same fraud in the inducement. In a similar action, the Waco Court of Appeals found that the defending party to a suit on a contract was entitled to a take-nothing judgment on the plaintiff's suit for balance due on the contract because fraud in the inducement is fatal to a contract and a good defense against the enforcement of such contract. *See Roberts v. Tipton,* 562 S.W.2d 921, 923 (Tex.Civ.App.—Waco 1978, no writ). The court also found that the defendant was entitled to fraud damages on his crossaction.

In *Roberts v. Tipton,* Tipton sold Roberts an insurance agency including the land and building, furniture and fixtures, and active files for $235,000.00. *Id.* at 922. Roberts paid the initial $55,000.00 required

by the contract but missed the second monthly payment of $2500.00. Tipton told Roberts he was "shutting the agency down," sold the building to others, removed all the furniture, took all the active files, and left Roberts with only his personal effects. Tipton then sued Roberts for the balance due on his contract and the jury found Tipton fraudulently induced Roberts into entering the contract, but the trial court entered judgment for Tipton for the balance due on his contract. *Id.*

In reversing the trial court and remanding for new trial, the court of appeals found Roberts was entitled to judgment that Tipton take nothing on Tipton's suit on the contract, because fraud in the inducement is fatal to a contract and a good defense against enforcement of such contract (citing several cases including Edward *Thompson Co. v. Sawyers,* 111 Tex. 374, 234 S.W. 873, 874 (1921); *Central Motor Co. v. Thompson,* 465 S.W.2d 405 (Tex.Civ.App.—Waco 1971, no writ) (suit on deficiency due on contract of sale of automobile; automobile returned to seller; take-nothing judgment against seller entered for balance due on contract for fraud in the inducement by seller)). *Id.* The Waco court also held that Roberts was entitled to damages for his fraud claim asserted in his cross action. *Id.*

The *Roberts* case was found to be an exception to the general rule requiring return of the consideration or an offer to return the parties to the status quo in *Gage v. Langford,* 615 S.W.2d 934, 940 (Tex.Civ.App.—Eastland 1981, writ ref'd n.r.e.). In *Gage,* a buyer of salvage rights in several oil leases defended the purchaser's suit on Gage's promissory note for fraud in the inducement of the underlying contract. The contract gave Gage the salvage rights to 271 wells, and he found only 206 wells, 51 of which were plugged and unsalvageable. However, he salvaged all the remaining wells and sold the salvage. Gage defended the suit on the promissory note for the salvage rights alleging fraud in the inducement stating that the seller fraudulently represented he would get the salvage rights to 271 wells when there were only 206 wells less the 51 wells that were plugged. Gage did not seek rescission, nor did he seek damages or an offset. Gage made no attempt to restore or offer to restore the parties to the original status. The *Gage* court cited all of the general rules we have discussed which require a party to return or offer to return the other party to the status quo, or return the benefits received, when rescinding the contract for fraud in the inducement. *Id.* at 937–940. The *Gage* court noted that in cases such as the *Roberts* case, it was held that a "defendant need only establish fraud to prevent recovery on a contract." *Gage,* 615 S.W.2d at 940. But, when a party "retains valuable consideration received under the contract, he must establish the extent of his damages." *Id.* at 940. Therefore, Gage could not recover because he did not establish "the proper remedy." *Id.*

This suit was filed by AGCO after it terminated the contract and sought damages for the breach of contract by Nibsco. Nibsco's pleadings establish their affirmative defense of fraud in the inducement by AGCO, but they did not ask that the contract be rescinded. Nibsco's contention on appeal is that they should not be liable for any contract damages from their breach, if any, because AGCO's fraud vitiates the contract to the extent of AGCO's resultant injury and is a defense to the suit on any obligation they have under the contract. *See Gage,* 615 S.W.2d at 937–938 (citing *Mason v. Peterson,* 250 S.W. 142 (Tex. Comm'n App.1923, holding approved)). AGCO has not shown that Nibsco has failed to return any "benefits" or otherwise "retained any valuable consideration" they

received under the contract. Nibsco has shown that they paid for everything they received under the agreement, and they returned the products it had on hand at termination. Accordingly, we find the trial court did not err in setting aside the jury findings awarding AGCO damages and attorney's fees on the grounds that Nibsco failed to return any benefits. We overrule AGCO's subpoint claiming error because Nibsco did not prove it returned any benefits under the agreement.

### The no-damages jury finding

■ In its next subpoint under its fraudulent inducement claim of error, AGCO asserts that the trial court erred in setting aside its jury award because the jury found no damages from AGCO's fraud.

■ Nibsco pleaded fraud in the inducement as an affirmative defense to AGCO's claim for damages under the contract. Nibsco pleaded the same fraud in the inducement as grounds for fraud damages in their counterclaim. It is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself. *See Dallas Farm Mach.*, 307 S.W.2d at 239 (" '[T]he law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it.' "). *See also Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 46–47 (Tex.1998).

■ A fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract. *Formosa*, 960 S.W.2d at 46–47. Tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the

plaintiff only suffers an economic loss related to the subject matter of the contract. *Id.* at 47.

Question No. 28 in the trial court's charge asked: "Did AGCO commit fraud against Nibsco, Niabco, and/or Niabco Ohio?" The jury answered "yes" to all three defendants. The instruction that followed provides, in pertinent part:

Fraud occurs when—

a. a party makes a material misrepresentation,

b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,

c. the misrepresentation is made with the intention that it should be acted on by the other party, and

d. the other party acts in reliance on the misrepresentation and thereby suffers injury.

The question is identical to PJC 105.1, and the instruction on common-law fraud, intentional misrepresentation, is identical to PJC 105.2. Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges PJC 105.1 & 105.2 (1997 Ed.). The comment cites that the source of instruction for fraudulent inducement as an affirmative defense is *Oilwell Division, United States Steel Corp. v. Fryer*, 493 S.W.2d 487, 491 (Tex.1973). The comment also states that the instruction also is proper for claims of actionable fraud. *Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex.1990).

■ By answering "yes" to Question No. 28, the jury found Nibsco was "injured" because part "d" requires that they must find "injury" before they can find AGCO committed fraud. "Before fraud will give rise to an action for deceit, or for rescission, or before a sufficient defense can be predicated thereon in an action on

the contract, the fraud practiced must result in injury." *Russell v. Industrial Transp. Co.*, 113 Tex. 441, 258 S.W. 462, 464 (Tex.1924). The word "damage" should not be restricted to a monetary loss; that is, it need not be measured in money, but it is sufficient if the defrauded party has been induced to incur legal liabilities or obligations different from that represented or contracted for. *Id.* Nibsco stated they refrained from selling their new F80 valve designed by Mr. Powell because they would violate their contract, and this abstention cost them money. We find that Nibsco proved an "injury."

■ Alternative pleadings may entitle the party to a jury question on both the affirmative defense and the counterclaim. *Kuehnhoefer v. Welch*, 893 S.W.2d 689, 692 (Tex.App.—Texarkana 1995, writ denied). This does not mean that the court has to ask the same question to the jury twice. *Id.* Even though no damages were found on the counterclaim, the jury found all of the essential elements of fraud in Question No. 28. Therefore, Nibsco was entitled to their affirmative defense of fraud because the jury found they were "injured," but could recover nothing for their affirmative counterclaim for the same fraud because the jury found Nibsco suffered no tort damages in Question No. 29. We overrule AGCO's second subpoint of error concerning the "injury" requirement of their affirmative defense of fraud. We further overrule AGCO's first main subpoint asserting fraudulent inducement does not excuse a breach of contract.

### Did AGCO fraudulently induce the agreements?

In its second main subpoint, AGCO asserts there is no evidence that it fraudulently induced Nibsco to enter into the agreement. AGCO contends there is no evidence to support Nibsco's claims that

they were fraudulently induced by AGCO's: (1) failing to inform Nibsco of AGCO's alleged "sub rosa plan" to terminate the contract after AGCO had obtained customer information from Nibsco, and then sell directly to Nibsco's customers; (2) misprepresenting that AGCO and Nibsco were "partners" and had "common goals;" and (3) misrepresenting that AGCO had no present intention of taking Praxair as a national account or otherwise cutting Nibsco "out of the loop" (sell direct to Nibsco's customers without paying Nibsco a commission).

### AGCO's failure to disclose its "sub rosa" plan

■ AGCO first contends the agreement expressly gave it the rights to receive customer information from Nibsco on a "nonconfidential basis" (section 4.3) and terminate the agreement "without cause" upon 60 days notice (section 7.1). AGCO asserts that "a party to a contract owes no duty to disclose its alleged intent to exercise its contract rights" citing *DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96 (Tex.1999). AGCO further argues that it did not have a confidential or fiduciary relationship with Nibsco that would give rise to a duty of disclosure.

■ The existence of a confidential relationship is but one of the bases for imposing a duty to disclose information. A duty to speak may arise in at least three other situations: First, when one voluntarily discloses information, he has a duty to disclose the whole truth. *State Nat'l Bank v. Farah Mfg. Co.*, 678 S.W.2d 661, 681 (Tex.App.—El Paso 1984, writ dism'd by agr.). Second, when one makes a representation, he has a duty to disclose new information when he is aware the new information makes the earlier representation misleading or untrue. *Susanoil, Inc. v. Continental Oil Co.*, 519 S.W.2d 230, 236

n. 6 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.). Finally, when one makes a partial disclosure and conveys a false impression, he has a duty to speak [emphasis added]. *Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 636 (Tex.App.—San Antonio 1993, writ denied); *International Security Life Ins. Co. v. Finck*, 475 S.W.2d 363, 370 (Tex.Civ.App.—Amarillo 1971), *rev'd on other grounds*, 496 S.W.2d 544 (Tex.1973).

AGCO contends that Nibsco's claim is "nothing more than an assertion that AGCO had a secret intent '[the "sub rosa" plan]' to exercise these contract rights, which is not an actionable claim." Nibsco argues that AGCO made explicit representations about its plans in order to induce the execution of the agreement. Bill Atkins, AGCO's general sales manager, testified that he told Nibsco that AGCO would not "take them out of the loop." Mr. Atkins told the Martins that "they were partners in this deal." Mr. Atkins agreed with Nibsco's attorney's statement: "It's not our intent to take any of these customers direct, we have a common objective here, we want to do things together, we have an equal interest in your being profitable with your customers as our own." Mr. Atkins agreed that he told the Martins these things immediately before and to convince them to sign the new contract.

Nibsco placed into evidence AGCO's internal memorandums from Hank Marsman, AGCO's regional sales manager, indicating that in 1990 he would "like to propose a plan to phase Nibsco/Niabco out of the AGCO picture with little risk" and that he would vote to terminate them. In 1993 Mr. Marsman's "Sales & Operations Plan" stated: "[C]ontingency plan for all Niabco territories will be developed as I seriously doubt they will comply with the terms of the 1992 rep agreement...." Mr.

Atkins stated that these were Mr. Marsman's goals, not AGCO's.

AGCO's assertions of no duty to disclose and lack of confidential relationship were also used by the appellant in *Ralston Purina Co.*, discussed in 850 S.W.2d at 634–635. In that case, McKendrick relied on a representation by Purina's agent that no written contract was required in order for McKendrick to buy a dealership being sold at a bankruptcy auction. *Id.* at 631–632. Purina's agent told McKendrick that a dealership with Purina was "a handshake deal" and the only written documents were documents requiring the dealer "to protect the Purina logo." *Id.* McKendrick bought the dealership at the auction sale and was required to enter a written contract with Purina which contained a terminable at will clause. *Id.* McKendrick sued for fraudulent inducement and other causes. The San Antonio Court of Appeals found Purina's failure to disclose defenses untenable. *Id.* at 634–635.

As does AGCO in this case, Purina cited cases holding a party, under no duty to volunteer information, should not be charged with the fraudulent failure to disclose in the absence of a reasonable inquiry made by the opposing party to discover such information. *Tempo Tamers, Inc. v. Crow-Houston Four, Ltd.*, 715 S.W.2d 658, 669 (Tex.App.—Dallas 1986, writ ref'd n.r.e.) (landlord had no duty to inform tenant it would enforce requirement in lease that tenant obtain written permission from landlord before erecting sign). *Purina*, 850 S.W.2d at 634, 635. In *Purina* the court of appeals held in pertinent part: "Unlike the cases relied on by Purina, McKendrick relies upon representations, rather than upon silence, as a basis for liability." "Further, even in arms-length transactions, a duty to disclose arises if a party knows, or should have known, its

prior statement was false. *Susanoil, Inc.,* 519 S.W.2d at 236 n. 6." *Id.*

As does AGCO in this case, Purina also relied upon *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 593–94 (Tex.1992). In *Crim Truck & Tractor Co.,* a party attempted to charge its opponent with silence or nondisclosure in the absence of a fiduciary relationship. 823 S.W.2d at 592, 596. The San Antonio Court held: "Mr. McKendrick does not contend Purina remained silent in the face of its duty to disclose; rather, McKendrick alleges the previous affirmative representations made by Purina's agent were false. Accordingly, we find *Crim Truck & Tractor Co.,* inapplicable." *Id.* at 635. In this case, Nibsco alleged that AGCO made affirmative representations that were false prior to entering into the agreement, and thus AGCO had a duty to disclose because they knew or should have known, its prior statements were false. *Purina,* 850 S.W.2d at 634–635. We find that AGCO's legal argument on failure to disclose is without merit, and we overrule this subpoint of error.

### Misrepresentations: "partners," "common goals," and "national account"

In its second subpoint under its contention that AGCO did not fraudulently induce Nibsco, they assert that Nibsco's argument that AGCO told Nibsco they would be "partners" and share "common goals" are not actionable. AGCO further asserts there is no evidence that Nibsco relied on these statements. AGCO also contends Nibsco's fraud claim based on AGCO's representations that it did not intend to take Praxair as a "national account" or to cut Nibsco "out of the loop" with respect to the Praxair account is legally insufficient. In support of these points, AGCO makes only a factual argument construing the evidence as it sees it.

AGCO contends only that there is no evidence to support these claims. In reviewing "no evidence" or legal sufficiency points, the court considers only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding under attack, and disregards all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex.1988); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

A "no evidence" point of error may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Juliette Fowler Homes, Inc. v. Welch Assocs.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *See Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992).

AGCO's argument goes to the weight of the evidence which is for the jury to determine. Bill Atkins' statements to induce Nibsco to sign the agreement that AGCO and Nibsco would be "partners" and share "common goals" is circumstantial evidence of misrepresentations based on AGCO's subsequent actions. Likewise, Mr. Atkins'

statements that he did not want Nibsco taken "out of the loop" is circumstantial evidence of fraud due to AGCO's contract with Praxair to sell valves to it directly after it terminated Nibsco.

While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony. *Id.*

Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *Spoljaric*, 708 S.W.2d at 435. "Slight circumstantial evidence" of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent. *Id.*

The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Jones v. Tarrant Utility Co.*, 638 S.W.2d 862, 866 (Tex.1982); *Lee-Wright, Inc. v. Hall*, 840 S.W.2d 572, 579–80 (Tex.App.—Houston [1st Dist.] 1992, no writ). The trier of fact may resolve conflicts and inconsistencies in the testimony of any one witness as well as the testimony of different witnesses. *Webb v. Jorns*, 488 S.W.2d 407, 411 (Tex. 1972); *Lee Wright*, Inc., 840 S.W.2d at 579–80. This court cannot retry the case or otherwise substitute its judgment or its opinion for that of the jury. *Lofton*, 720 S.W.2d at 805; *Baptist Memorial Hosp. Sys. v. Smith*, 822 S.W.2d 67, 81 (Tex. App.—San Antonio 1991, writ denied).

We find there is ample evidence of probative force to support the jury's finding of fraud. We overrule AGCO's no-evidence contention under this subpoint.

## The invalid theory of liability in the jury charge regarding Nibsco's fraud claim

In its third subpoint under the first issue, AGCO contends the trial court erred in denying its jury award of damages arising from Nibsco's breach. AGCO contends the jury's answer to Question No. 2 conflicts with its answer to Question No. 28. In Question No. 2, the jury found that Nibsco's failure to comply with one or more of their agreements with AGCO was not excused by any false representation or concealed material facts by AGCO. In Question No. 28, the jury found AGCO committed fraud against Nibsco. AGCO argues that the specific finding that AGCO did not make any false representation or conceal material facts in Question No. 2 should control over the general finding of fraud in Question No. 28.

Where a party alleges conflicting jury answers, the threshold inquiry is whether the findings are about the same material fact. *Bender v. Southern Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex.1980). If the findings are about the same material fact, an appellate court must attempt to reconcile any conflict in the findings. *Id.* Where the questions are amenable to more than one reasonable construction, we should adopt the construction that avoids a conflict. *Id. See also Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*, 817 S.W.2d 160, 167 (Tex. App.—Houston [14th Dist.] 1991, no writ).

At the charge conference, Nibsco's attorney explained to the trial court that Question No. 2 was based on the pattern jury charge for equitable estoppel, and the misrepresentations relied upon for the estoppel of AGCO's claim of breach of contract dealt with the agreements *after* they

were executed. The issue argued to the jury was that some schedules that were attached to the contracts were left blank. Question No. 28 concerned the affirmative defense of fraud and Nibsco's counterclaim for fraud damages. The issue argued to the jury concerned AGCO's misrepresentations made *before* the contracts were executed, which AGCO allegedly made to induce Nibsco to sign the contracts.

Accordingly, we hold the findings are about different material facts and do not conflict. We overrule AGCO's contention that Questions No. 2 and No. 28 conflict.

### Does the jury's finding of fraud by Nibsco bar Nibsco's recovery?

■ In its fourth subpoint of its first issue AGCO contends that if AGCO's fraud precludes its recovery for breach of contract, then the jury's finding of fraud by Nibsco precludes its recovery. Question No. 5 asked if the defendants listed below (Nibsco, Niabco, Niabco Ohio, Buck Martin, and Kevin Martin) committed fraud against AGCO. The question and definitions were identical to those in Question No. 28 which asked if AGCO committed fraud against Nibsco. The jury answered "yes" for each party listed. Nibsco filed its motion for judgment on the verdict and to disregard certain findings of the Jury, which included the jury's findings in Question No. 5. Nibsco's motion contended all of the findings were immaterial.

In their motion to disregard Question No. 5, Nibsco contended that the jury's finding of Nibsco's fraud cannot bar their award for AGCO's failure to pay for Nibsco's return of the remaining inventory after AGCO terminated the contract. Nibsco alleged that AGCO was obligated to pay for the inventory by its obligations to repurchase the inventory pursuant to purchase orders that were separate and distinct from the 1992 Agreement, even if the 1992 Agreement was otherwise unenforceable. The jury found AGCO failed to comply with its agreement or agreements under the 1992 Representative Agreement concerning this inventory return (Question No. 37), and found that AGCO was obligated to pay Nibsco $170,288.55 as damages (Question No. 38). Nibsco further alleged that Question No. 5 should be disregarded as immaterial with regard to the jury's finding of tortious interference on the part of AGCO (Question No. 33), and its award of $243,306.66 for Nibsco's lost profits resulting from that interference (Question No. 34). Nibsco contended that the jury finding of fraud was in connection with their activities in making duplicate valves, developing the F80 valve, and other matters concerning their operations under the 1992 contract. Nibsco contended that these activities could not be a bar to their tortious interference claim against AGCO in acquiring the Praxair account. The trial court's final judgment granted Nibsco's motion to disregard the jury's answer to Question No. 5, and other questions, and denied AGCO's motion. The grounds for granting Nibsco's motion were not specified in the trial court's judgment.

■ A trial court may disregard a jury finding only if it is unsupported by evidence or if the issue is immaterial. *Spencer v. Eagle Star Ins. Co. of America,* 876 S.W.2d 154, 157 (Tex.1994). A question is immaterial when it should not have been submitted, or when it was properly submitted but has been rendered immaterial by other findings. *Id.* A question which calls for a finding beyond the province of the jury, such as a question of law, may be deemed immaterial. *Id.*

■ The trial court may disregard a jury's finding on an immaterial issue and render judgment based upon the remaining findings; such a judgment is not considered as one rendered *non obstante ver-*

*dicto. Kuehnhoefer,* 893 S.W.2d at 692; *Dewberry v. McBride,* 634 S.W.2d 53 (Tex. App.—Beaumont 1982, no writ); *J.R. Neatherlin Corp. v. Baughman,* 580 S.W.2d 129, 130 (Tex.Civ.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.). If Question No. 5 was immaterial, then it was properly disregarded; otherwise, the trial court had no authority to disregard it and committed reversible error. *Kuehnhoefer,* 893 S.W.2d at 692

A "none" answer on the damages issue renders the liability issue immaterial. *Id.* In Question No. 6, the jury found AGCO incurred no damages because of Nibsco's fraud. This would render the jury's answer to Question No. 5 immaterial if the question concerned AGCO's *affirmative claim* for fraud. *Id.* We held that AGCO's fraud against Nibsco was not a bar to Nibsco's *affirmative defense* of fraud which required only that the jury find an injury. AGCO makes no such claim concerning the jury's answer to Question No. 5. AGCO only argues that "it was fundamentally inconsistent and erroneous for the trial court to conclude that AGCO's alleged fraud precludes its recovery for breach of contract while the fraud of Nibsco does not preclude their recovery." Other than complain that the trial court was wrong in accepting the argument of Nibsco furnished in connection with its motion to disregard Question No. 5, AGCO does not attempt to show on appeal that this question was material.

AGCO cites no authority and provides no persuasive legal argument concerning this novel point of error. Unsupported points of error are waived. TEX. R.APP.P. 38.1(g) & (h). *See also Trenholm v. Ratcliff,* 646 S.W.2d 927, 934 (Tex.1983). We overrule AGCO's contention that the trial court erred in disregarding the jury's findings that Nibsco committed fraud against AGCO.

## NIBSCO'S TORTIOUS INTERFERENCE CLAIM

AGCO's second major issue on appeal is that the trial court erroneously entered judgment against AGCO on Nibsco's tortious interference claim. In Question No. 32, the jury was asked: "Did AGCO intentionally interfere with Nibsco's contract with Praxair?" The jury answered "yes." In Question No. 33, the jury found AGCO's interference with the contract was not privileged. In Question No. 34, the jury awarded Nibsco $243,306.66 in damages for lost profits arising from AGCO's interference. The trial court entered judgment in favor of Nibsco for that amount plus prejudgment and postjudgment interest.

In two subpoints, AGCO contends: (1) the evidence is legally and factually insufficient to show that an unprivileged act of interference by AGCO caused Nibsco to lose any sales to Praxair; and (2) the evidence is legally and factually insufficient to support the findings of damages.

### Standard of Review

In a legal sufficiency challenge, the court considers only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding under attack, and disregards all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex. 1988); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

To prevail on their factual sufficiency challenges, AGCO must show that

the adverse findings are against the great weight and preponderance of the evidence. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam). In conducting this review, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Id.* We must uphold the jury's finding unless it is so against the great weight and preponderance of the evidence as to be manifestly unjust or erroneous. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex. 1986). *See also Knoll v. Neblett,* 966 S.W.2d 622, 629 (Tex .App.—Houston [14th Dist.] 1998, pet. denied).

### Evidence of tortious interference

■ Under its first subpoint of the tortious interference issue, AGCO contends that it had the right to terminate the agreement on 60 days' notice "without cause." AGCO then argues that Nibsco's lost sales arose after AGCO legally terminated the contract, which was a privileged act, and there is no evidence that Nibsco's lost sales arose from an act of interference.

Nibsco contends the evidence shows, and the jury believed, that AGCO had always planned to take Praxair, and after they got the information they wanted from Nibsco under the contract, they terminated the contract and immediately sold directly to Praxair.

■ The elements of tortious interference with a contract are: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage; and (4) actual damage or loss. *Powell Indus., Inc. v. Allen,* 985 S.W.2d 455, 456 (Tex.1998) (per curiam). *See ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997).

Mr. Hyland testified that he talked to Buck and Kevin Martin about a blanket contract with Praxair whereby AGCO would sell valves to Praxair direct and pay Nibsco a commission. Praxair was Nibsco's biggest customer and provided a large part of Nibsco's income. Mr. Hyland testified that AGCO had been talking to Praxair since 1991 about a discounted direct-sales contract with Praxair.

An interoffice memo from Marsman to Ed Ross dated April 18, 1991, stated in pertinent part:

> We need to take action now! I have told Linde [Praxair] we will extend a blanket proposal (which must be similar to Air Products ... they talk) by mid-May. They would like to visit Stafford [AGCO's office in Stafford, Texas] end May/early June, hopefully while I'm there anyway for the company picnic, I can orchestrate Linde's schedule.

Ed Ross, the general sales manager before Mr. Atkins, admitted having dealings with Praxair in 1991 and discussing a blanket contract with them without the appellees' knowledge. Mr. Ross was responsible for the business strategy related to Praxair since 1991. After AGCO terminated Nibsco, they entered into a blanket contract with Praxair.

We find the evidence is legally and factually sufficient to sustain the jury's finding of AGCO's tortious interference with Nibsco's contract with Praxair. We overrule AGCO's subpoint of error on the sufficiency of the evidence to sustain the jury's findings of tortious interference.

### Sufficiency of the evidence to support the damages

■ In its second subpoint under its tortious interference issue, AGCO contends the evidence is legally and factually insufficient to support either the existence or the amount of lost profits awarded by the jury.

A plaintiff in an action for tortious interference with a contract must prove that he or she suffered actual damages. *Hughes v. Houston Northwest Medical Ctr., Inc.,* 680 S.W.2d 838, 842 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 571, 88 L.Ed.2d 555 (1985). Although the evidence must show the existence of damages with reasonable certainty, the actual amount of damages need not be certain. *Id.* The basic measure of actual damages in an action for tortious interference with contract is the same as the measure of damages for breach of the contract at issue. *American Natural Petroleum Co. v. Transcontinental Gas Pipe Line Corp.,* 798 S.W.2d 274, 278 (Tex. 1990); *Capital Title Co. v. Donaldson,* 739 S.W.2d 384, 391 (Tex.App.—Houston [1st Dist.] 1987, no writ). In assessing actual damages, the jury should attempt to put the plaintiff in the same economic position he would have been in had the contract not been breached. *Armendariz v. Mora,* 553 S.W.2d 400, 406(Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.).

The new contract between AGCO and Praxair was dated April 26, 1996, and was for a three year period commencing October 1, 1995. Mr. Raymond Pofi, the procurement manager for Praxair, authenticated the contract. The contract indicates that Praxair anticipated a savings of $1,160,000.00 as a direct result of buying direct from AGCO over the three year period. Kenneth Miller, a CPA, testified that all but $73,000.00 of Praxair's savings "would necessarily have to come from reduced commissions and/or markup to the stocking rep or the manufacturer's representative [Nibsco]." We find that the jury had proof of damages of at least $1,087,000.00 in lost profits ("reduced commissions and/or markup"). The jury awarded $243,306.66.

The trier of fact has the discretion to award damages within the range of the evidence presented at trial. *City of Houston v. Harris County Outdoor Adver. Ass'n,* 879 S.W.2d 322, 334 (Tex.App.—Houston [14th Dist.] 1994, writ denied). We are not permitted to disregard the jury's damages award on the basis that the jury's reasoning in arriving at its figure is unclear. *Adams v. Petrade Int'l, Inc.* 754 S.W.2d 696, 710 (Tex.App.—Houston [1st Dist.] 1988, writ denied). Therefore, because the jury award is an amount within the range of evidence presented to the jury, we conclude that there was sufficient evidence to support the damages award. *See Duggan v. Marshall,* 7 S.W.3d 888, 893 (Tex.App.—Houston [1st Dist.] 1999, no pet. h.). We overrule AGCO's contentions concerning the legal and factual sufficiency of the evidence to prove damages.

### THE F80 VALVE PATENT

In its third major issue, AGCO asserts that the trial court erred in not awarding AGCO ownership of the F80 valve patent and machine drawings notwithstanding the jury's findings. AGCO argues that section 6.1 of the agreement controls, and that any "intellectual property that may be developed in the course of Representative's performance of this Agreement or which relates in any manner to the Products shall be the sole property of the Manufacturer." In Question No. 26, the jury was asked: "Is the Intellectual Property concerning the F80, if any, related in any manner to the (i) AGCO 80 Series Valves or (ii) the AGCO 83F Valve?" The jury answered "no." In Question No. 27, the jury was asked: "Is the Intellectual Property concerning the Flow Safe F7000/8000 Series Pilot Operated Safety Relief Valves, if any, related in any manner to AGCO Pilot Operated Safe-

ty Relief Valves?" Again, the jury answered "no."

Walter Powell invented the original AGCO 80 series valve thirty years ago, and his patent on it had expired. Mr. Powell testified that he "just designed a new valve." He explained the entire design and development process to the jury, showing how he did not use AGCO's technology or valves in any way. AGCO argues that the F80 patent expressly states that the F80 is "similar in construction" to AGCO's 80 series. The Martins quoted the F80 to customers as a substitute for AGCO's series 80 valves.

Nibsco argued to the jury that the F80 was a new valve developed by Nibsco, and it is not a modification of AGCO's "product." Nibsco argued that section 6.1 says only that any "intellectual property" belonging to AGCO developed or relating to AGCO valves shall remain the property of AGCO. Section 6.1 provides:

All intellectual property rights relating to the Products [AGCO products] and/or to this Agreement, including, but not limited to, all trademarks, copyrights, patents, trade names, trade secrets, logotypes, advertising and other commercial symbols, service marks, and goodwill (herein collectively referred to as "Intellectual Property"), are and shall remain the sale property of Manufacturer.

Throughout section 6.1, "Intellectual Property" is referred to as "Intellectual Property of Manufacturer." The contract further provides:

Representative agrees that it will not use Intellectual Property (including, but not limited to, the words or acronym "Kunkle," "Lonergan," "Anderson," "Greenwood," and "AGCO") except to designate the Products of which it is a representative. Nothing in this Agreement shall be deemed to confer upon or grant to the Representative any trademarks, service marks, trade names, logotypes, *or other Intellectual Property,* or in the good will now or hereafter associated therewith.... Upon the termination or expiration of this Agreement, Representative shall immediately discontinue all use *of all such* Intellectual Property. Representative agrees that any Intellectual Property that may be developed in the course of Representative's performance of this Agreement or which relates in any manner to the Products shall be the sole property of Manufacturer.

Nibsco argued to the jury that the contract made reference only to AGCO's "Intellectual Property" that was "developed." Nibsco stressed that because the F80 was the "intellectual property" of Flow Safe, not AGCO, it did not "relate in any manner" to AGCO's Products under section 6.1 of the contract.

AGCO's argument essentially challenges the legal and factual sufficiency of the evidence to support the jury's findings that Flow Safe's valves did not "relate in any manner" to AGCO's valves. The jury could interpret the intent of the parties with respect to section 6.1. *See Martin v. Black,* 909 S.W.2d 192, 196 (Tex.App.—Houston [14th Dist.] 1995, writ denied) ("intention is usually an inference to be drawn by the fact finder from other facts and circumstances," citing *Scott v. Ingle Brothers Pacific, Inc.,* 489 S.W.2d 554, 557 (Tex.1972)). As argued by Nibsco, the jury could find that it was the intention of the parties that the Intellectual Property refers only to AGCO's Intellectual Property, not Flow Safe's Intellectual Property. The jury also had evidence that the F80 was a new product, a better valve, and was not a modification or an improvement on AGCO's valve. We find the evidence is legally and factually sufficient to support

the jury's findings that Flow Safe's new valves did not relate in any manner to AGCO's valves. We overrule AGCO's contention that the trial court erred in not setting aside the jury's findings that Flow Safe's new valves did not relate to AGCO's valves according to the contract.

## APPELLATE ATTORNEY FEES

In its fourth major issue, AGCO contends the trial court erroneously denied AGCO recovery of its appellate attorney's fees. In Question 25, the jury allowed AGCO $750,000.00 as attorney's fees for preparation and trial, but nothing for any appeals. Robin Harrison testified for AGCO that reasonable and necessary attorney's fees for an appeal to the court of appeals would be $100,000.00; for filing a petition for review with the supreme court, $40,000, and $25,000.00 if review by the supreme court is granted. He was questioned at length on cross-examination by Nibsco as to the reasonableness and necessity of AGCO's attorney fees. The trial court refused to award any amount in its judgment for such attorney fees.

The trier of fact, in its discretion, *may* allow a fee to an attorney for an appeal, but is not required to do so. *Mid County Rental Serv., Inc. v. Miner Dederick Const. Corp.*, 583 S.W.2d 428, 429 (Tex. Civ.App.—Beaumont 1979), *rev'd on other grounds*, 603 S.W.2d 193 (Tex.1980); *Bernard v. Bernard*, 491 S.W.2d 222, 225 (Tex. Civ.App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.). The trial court did not err in refusing to disregard the jury's answers to Question No. 25 concerning appellate attorney's fees. *See Edwards v. Holleman*, 842 S.W.2d 704, 707–708 (Tex.App.—Houston [1st Dist.] 1992), *rev'd on other grounds*, 862 S.W.2d 580 (Tex.1993). We overrule AGCO's contentions in its fourth issue concerning refusal of the trial court to disregard the jury's answers concerning appellate attorney's fees.

We affirm the judgment of the trial court.